IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

KENNETH M. COOK,

       Petitioner,

  v.                                  **Case No. 07-3149-RDR**

DAVID R. McKUNE, Warden,
Lansing Correctional Facility;
ATTORNEY GENERAL of KANSAS,

       Respondents.

## MEMORANDUM AND ORDER

    This matter is presently before the court upon petitioner's application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Having carefully reviewed the arguments of the parties, the court is now prepared to rule.

    Petitioner was originally convicted in 1993 of first degree murder. His conviction was affirmed by the Kansas Supreme Court. State v. Cook, 259 Kan. 370, 913 P.2d 97 (1996). He filed a petition for habeas corpus in this court, which was denied by Judge Saffels. On appeal, the Tenth Circuit Court of Appeals determined that the petitioner's Sixth Amendment right to confrontation had been denied because the prosecution had not exercised due diligence to secure a witness whose testimony at the preliminary hearing was admitted as evidence at the trial. Cook v. McKune, 323 F.3d 825, 840 (10th Cir. 2003). The Tenth Circuit reversed and remanded with directions to grant the writ. Id. The petitioner was retried and

subsequently convicted of second degree murder.  His conviction was once again affirmed by the Kansas Supreme Court.  State v. Cook, 281 Kan. 961, 135 P.3d 1147 (2006).  Petitioner filed the instant petition on June 6, 2007.

The petitioner raises five issues in his motion, the same matters that he asserted before the Kansas Supreme Court.  He contends that the following trial court rulings were violations of clearly established federal law:  (1) the denial of his motion for a psychological examination of a key witness; (2) the denial of a request for a continuance so he could obtain psychiatric records of the same witness; (3) the denial of a motion to recall the jury; (4) the denial of a motion for new trial based upon newly discovered evidence; and (5) the enhancement of his sentence based upon judicially-found facts.

I.

The facts of this case as set forth by the Kansas Supreme Court in its opinion are as follows:

> On September 13, 1992, a fisherman discovered a body in the Wakarusa River. The Shawnee County Sheriff was notified. The body was tied to a square metal beam that weighed about 50 pounds. Divers also found a piece of carpet in the river close to the location of the body.
> An autopsy revealed that the man had been dead approximately 7 days and that he died as a result of bleeding from a bullet wound in the chest that damaged the main artery from the heart. A second bullet had entered his left upper back. The pathologist found no defensive wounds and concluded the man had not been shot at close range. The recovered bullets were of a very unusual type. The autopsy also revealed that after death, to hide identity of the victim, the victim's teeth had

been removed and patches of tattooed skin and subcutaneous tissue had been cut from each of the victim's upper arms. The body eventually was identified from fingerprints as that of Charles Duty, a/k/a Donnie Perkins, a/k/a Billy Ray Davenport.

At the second trial, David Rudell, whose testimony at the preliminary hearing had been improperly admitted in the first trial, testified that Cook shot Duty on September 7, 1992. Rudell stated at that time he lived on Orange Street in Baldwin, Kansas. Cook and Beth Hebert had moved in with Rudell two or three days prior to September 7. They had moved from a small house on Lime Street in northeast Topeka. Duty had lived with them in the small house for a very brief time.

Around noon on September 7, Rudell drove Cook and Hebert in his pickup to the house on Lime Street to move their furniture. Cook had a gun. Cook informed Rudell there might be a confrontation with Duty because Hebert had previously stolen pills from Duty. Duty had AIDS and, on September 1, he had obtained a prescription for 400 tablets of the narcotic, Hydrocodone, and 100 10-milligram tablets of Valium.

The gun Cook had belonged to Leonard Smith. It was a .31 caliber cap-and-ball pistol, a reproduction of an 1849 Colt pistol. The gun's projectile is a lead ball that is shot when black powder is ignited by the hammer hitting a firing cap. Smith loaned the gun to Cook in the spring of 1992. The first weekend in September Cook asked Smith for more ammunition. Smith provided the additional ammunition necessary to fire the gun.

Rudell further testified that when they arrived at the Lime Street house, Cook and Hebert got out of the truck. Rudell turned the truck around to load furniture. Rudell then got out of the truck. Hebert, who was standing outside a window of the house crying, stated, "He shot him."

Rudell entered the house. Gun smoke hung in the air. Cook was standing in the bedroom with the cap-and-ball pistol in his hand. Duty was half in and half out of the bed, tangled in the sheet. There was blood on the wall and a bloody wound on the left side of Duty's chest.

Cook dragged Duty's body to the garage where he pulled out Duty's teeth with pliers. Cook, Hebert and Rudell then drove to the Tin Shed, a motorcycle business, and obtained a 6- to 7-feet long square steel beam. They returned to the Lime Street house. Cook wrapped Duty's body in a piece of carpet and then put the body in the back of the truck. Furniture was loaded on top of the

body. They then drove to the Wakarusa River and parked at a spot used by fishermen. Cook took Duty's body and the steel beam down an embankment to the river. Using black nylon rope from the garage of the Lime Street house, Cook tied Duty's body to the steel beam, then dragged Duty's body into the river until it sank below the surface. Before returning to Baldwin, Cook, Hebert and Rudell returned to the Lime Street house, removed Duty's possessions, and then burned them.

Leonard Smith, owner of the cap-and-ball pistol, testified that while visiting Smith at his trailer in Carbondale, Cook had stated that after he shot and killed a guy on Lime Street with the .31 caliber pistol, Cook informed Smith that he then tied the body to a piece of steel from the Tin Shed and threw the body in the Wakarusa River.

Beth Hebert testified that when Duty was killed, she had gone to the Lime Street house with Smith and Rudell to throw Duty out of the house and retrieve some furniture. Hebert testified that while Rudell was still in the truck, Smith went into the house. She then heard two gunshots. Hebert stated that they stayed with Duty's body for 4 hours. Hebert was aware that Duty took massive amounts of painkillers and other drugs. Hebert had previously purchased drugs from Duty. Hebert stated that after Duty's death, she got high on Oxycodone they had found in Duty's underwear. Eventually they moved the body to the garage. After dark they put it into the truck, then drove to the Wakarusa River.

In 1993 Beth Hebert told Darrin Busey, whom she became intimate with after they met at the Parkview Rehabilitation Center, that after she had stolen drugs from Duty, Cook shot Duty with a black powder-type of gun. During this conversation, Hebert never mentioned Leonard Smith's presence at the shooting to Busey.

Cook, 135 P.3d at 1150-51.

The court will address other facts as we consider the arguments raised by the petitioner.

II.

A writ of habeas corpus may not be granted unless the state court's decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States," or, "was based on an unreasonable determination of the facts in light of the evidence presented at trial."  28 U.S.C. § 2254(d)(1)&(2).  State court factual findings are presumed correct, absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1).

The Supreme Court has stated that a state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in our cases" or if the state court "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

The law limits the authority of the court to hold an evidentiary hearing upon petitioner's application for relief:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - - (A) the claim relies on - - (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and

5

>   convincing evidence that but for constitutional error, no
>   reasonable factfinder would have found the applicant
>   guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

## III.

The first two arguments raised by the petitioner are related. He contends the state trial court violated clearly-established law by denying his motion for a psychological examination of Rudell and by denying his motion for a continuance so he could obtain psychiatric records of Rudell. He suggests that these rulings violated his Sixth Amendment right to effectively cross-examine Rudell, the state's "star witness." He argues that these denials prevented him from cross-examining Rudell on his mental illness.

Following the decision of the Tenth Circuit, trial proceedings began again in state district court. Counsel for the petitioner was appointed in June 2003. At that time, Rudell could not be found by the prosecution. The petitioner sought to have the trial scheduled as soon as possible. After some efforts by both sides and the court, the trial was set for August 11, 2003. Pursuant to a material witness warrant, Rudell was found in California on July 21, 2003. He was returned to Kansas and held in jail pending trial. He subsequently sought release. Defense counsel interviewed Rudell on July 24, 2003. Following that interview, the petitioner sought a psychiatric examination of Rudell because he had previously been hospitalized for mental problems. The

petitioner argued that Rudell was a critical witness for the State, and the psychiatric examination was necessary so an effective cross-examination of Rudell could be performed. The court held a hearing on August 4, 2003 and denied the motion for psychiatric examination. The court subsequently denied Rudell's motion for release pending trial. Defense counsel then sought a continuance in order to obtain some of Rudell's psychological records. The trial court also denied the continuance request.

During trial, Rudell testified about his past mental issues. He testified that he was in a bad motorcycle accident in 1991 or 1992. As a result of that accident, he was hospitalized for several weeks and was given morphine for the pain. Rudell left the hospital against medical advice and suffered from morphine withdrawal. He testified that he was depressed due to the morphine withdrawal. He was ultimately admitted to Topeka State Hospital by his ex-wife and Dr. John Greene to ensure that he would not harm himself. Dr. Greene had examined Rudell and determined that he suffered from schizoaffective disorder. Dr. Jose Bulatao, a psychiatrist at Topeka State Hospital, evaluated Rudell after Rudell was admitted. He did not find that Rudell was suffering from any type of mental disorder. He discharged Rudell from Topeka State Hospital within two days after Rudell was admitted. Dr. Bulatao was a witness at the second trial, and he testified to the aforementioned matters. The petitioner's counsel extensively

cross-examined him about the hospitalization and Dr. Greene's contemporaneous report.

"[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." United States v. Owens, 484 U.S. 554, 559 (1988)(citations omitted and emphasis in original). The Confrontation Clause allows trial courts to impose limits on the cross-examination of a prosecution witness. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). A defendant's Sixth Amendment rights are not infringed where (1) the jury is exposed to facts sufficient for it to draw inferences relating to the reliability of the witness; and (2) the cross-examination enables defense counsel to make a record from which he can argue why the witness might have been biased. United States v. Van Dorn, 935 F.2d 1331, 1335 (11th Cir. 1991). Federal law is well-settled that a defendant does not have the right under the Confrontation Clause to a have psychiatric examination of a witness, even if that witness is vital or significant to the government's case. Gilpin v. McCormick, 921 F.2d 928, 932 (9th Cir. 1990). Rather, a defendant's right to confront his accusers is satisfied by the right to cross-examine them. Id.

A thorough review of the record reveals that the trial court allowed petitioner's counsel sufficient latitude in the scope of his cross-examination of Rudell's mental problems. Petitioner's

counsel was able to explore Rudell's commitment in 1991 to Topeka State Hospital with both Rudell and Dr. Bulatao. Defense counsel was able to use Dr. Greene's report during these cross-examinations. The cross-examination clearly exposed the jury to facts sufficient for it to conclude that Rudell may not be a credible witness. In sum, the court is not persuaded that the rulings of the trial court violated established federal law.

Moreover, the court finds no abuse of discretion by the trial court in denying petitioner's motion for a continuance. When denial of a continuance is asserted as the basis for a habeas petition, the petitioner must show that not only was the denial of the continuance an abuse of discretion, but also that the denial was "'so arbitrary and fundamentally unfair that it violates constitutional principles of due process.'" Case v. Mondragon, 887 F.2d 1388, 1396 (10th Cir. 1989) (quoting Hicks v. Wainwright, 633 F.2d 1146, 1148 (5th Cir. 1981)). In determining whether the denial was fundamentally unfair, the court's focus is on the petitioner's "need for a continuance and the prejudice or lack of prejudice resulting from its denial." Id. at 1397. The request made by the defendant at trial for a continuance was based entirely upon speculation. Defense counsel was not able to point to any material that could have been discovered even if a continuance were granted. Even at this late date, the petitioner has failed to come forward with any documents or files that would have been found if a

9

continuance had been granted. The court believes that the trial judge properly balanced the interests of all involved in denying the motion for continuance. The court fails to find that petitioner has made an adequate showing of prejudice. The court certainly does not find that the failure to grant a continuance violated established federal law.

### IV.

Petitioner next argues that his Sixth Amendment right to a fair trial was violated when the trial court failed to recall the jury after affidavits demonstrated that during deliberations a juror or jurors became aware that petitioner's case was in fact a retrial and that he had been found guilty by the previous jury.

Prior to the retrial, the petitioner filed a motion on how the parties should address a potential juror's knowledge of the previous trial. The petitioner argued that witnesses should be instructed not to mention the previous trial and that jurors should be excused if they knew the case was being tried for a second time. At a hearing on the motion, the State agreed that during voir dire it was necessary to determine the extent of a prospective juror's knowledge of the previous trial. The State, however, argued there was a distinction between knowledge about a retrial and knowledge about a previous conviction in the former trial.

During voir dire, the trial judge excused prospective jurors who knew that petitioner had been previously convicted and that it

was a retrial. The judge, however, allowed at least one juror in the juror pool to remain even though she knew that it was a retrial because she did not know that petitioner was previously convicted. The judge stated that she was drawing the line "as to whether or not they knew about the conviction."

Following his conviction, petitioner filed a motion to recall the jury based upon an affidavit of juror D.G.S. in which he stated he heard a juror state that petitioner's case was a retrial and that petitioner had previously been convicted. Petitioner contended that this extrinsic evidence had entered the jury's deliberations and had prejudiced his right to a fair trial guaranteed by the Sixth Amendment. Petitioner argued that a recall of the entire jury was necessary to determine whether a juror or jurors used this particular information in their deliberations. The State responded and produced four affidavits from other jurors. Juror K.D.L. recalled that the issue of a retrial had been noted during deliberations. He stated: "I recall it was mentioned early in the deliberations. The foreman said this case had to be a retrial, because the murder happened so long ago and we heard witnesses' testimony from a prior trial. He did say that we had to do this right. Nothing was said about any result of a prior trial, or contents of any prior trial. He did not present this as his personal knowledge, but more like he was drawing that conclusion from the fact the case was old and there was testimony from a prior

11

trial." Juror G.L. indicated that he recalled someone said that it was a retrial during deliberations. He could not, however, recall which juror. He further stated: "Nothing was said about any result of a prior trial. During the trial someone at work mentioned it was retrial. Nothing was said about any result of the prior trial. I did not discuss this with the other jurors. I got the impression this was a retrial anyway during the course of the trial, from the fact that witnesses were asked about their prior testimony." Juror M.M. recalled there was "some momentary speculation" where some jurors wondered if the case was a retrial. The juror further noted that someone then said that the prior result did not matter and it was not discussed further. Juror D.S. did not recall that any juror talked about a retrial during deliberations or about the petitioner being previously convicted. This juror did indicate that it became evident to him during the course of the trial that it was probably a retrial.

Following oral argument, the trial court issued an opinion denying petitioner's motion to recall the jury. The court found that defendant had not met his burden in showing the necessity for a recall. On appeal, the Kansas Supreme Court rejected petitioner's arguments. The Court found that petitioner had not sufficiently demonstrated prejudice. The Court further found that the trial court had "scrupulously articulated the reasons for her discretionary decision," and thus determined there was no abuse of

12

discretion.

A jury's verdict "must be based upon the evidence developed at the trial." Irvin v. Dowd, 366 U.S. 717, 722 (1961). Under the Sixth and Fourteenth Amendments, "trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Turner v. Louisiana, 379 U.S. 466, 472-73 (1965).

Relying upon Remmer v. United States, 347 U.S. 227, 229 (1954), petitioner contends that the trial judge violated clearly established federal law by failing to recall the jury after receipt of the affidavit indicating that a juror was made aware during deliberations that the trial was a retrial and that the petitioner had been previously convicted. In Remmer, the petitioner discovered after the jury had returned a guilty verdict that an unnamed person had communicated with a juror during the trial and had "remarked to him that he could profit by bringing in a verdict favorable to the petitioner." 347 U.S. at 228. After the juror reported the incident to the judge, the judge informed the prosecutor and the Federal Bureau of Investigation(FBI). The FBI investigated the incident and delivered its report to the judge. Neither the petitioner nor his attorney were informed of the incident. They learned of it through newspaper accounts published

13

after the jury's verdict had been returned.

The Supreme Court remanded the case to the district "to hold a hearing to determine whether the incident complained of was harmful to the petitioner, and if after [a] hearing it is found to have been harmful, to grant a new trial." Id. at 230.  It further determined that

> [i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

Id. at 229.  The Court held that this presumption is not conclusive, but that the government bears a heavy burden to establish that any contact with a juror "was harmless to the defendant." Id.

Petitioner argues, based upon Remmer, that the trial court should have applied a presumption of prejudice and recalled the jury for an evidentiary hearing.  We must disagree.  The presumption of prejudice contained in Remmer does not apply in habeas cases.  Crease v. McKune, 189 F.3d 1188, 1193 (10th Cir. 1999).  In the habeas corpus context, a federal court may grant relief only where the alleged juror misconduct "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Without the presumption, the petitioner has the burden of demonstrating

prejudice. As one judge noted recently: "[T]here is no Supreme Court authority clearly articulating the specific circumstances under which an extraneous influence might prejudice a juror, and 'each case must turn on its special facts.'" McNeill v. Polk, 476 F.3d 206, 226 (4th Cir. 2007) (King, J., concurring in part and concurring in the judgment)(quoting Marshall v. United States, 360 U.S. 310, 312 (1959)).

The court fails to find that the decision of the Kansas Supreme Court violated clearly established federal law as suggested by the petitioner. Since this is a habeas case, the presumption of prejudice set forth in Remmer was not applicable. We find no Supreme Court precedent that requires a hearing on the facts before us. Petitioner failed to produce evidence that the juror misconduct had a substantial and injurious effect or influence in the jury verdict. Without such a showing, petitioner is not entitled to relief based on this argument.

V.

The petitioner next contends that the state trial court violated clearly established law by denying his motion for new trial based upon newly discovered evidence. He asserts that the trial court should have granted a new trial based upon the testimony of Darren Warner. He suggests that the trial court made an unreasonable determination of facts because the testimony of Warner was credible or more credible than the evidence presented by

the prosecution.

Prior to sentencing, the petitioner filed a motion for new trial based upon newly discovered evidence. A hearing was held where the trial court heard the testimony of Warner. The testimony of Warner was summarized by the Kansas Supreme Court as follows:

> At a hearing on the motion for new trial, Darren Warner testified that before Thanksgiving in November 1993, he stopped in to see Delbert Smith, Leonard Smith's brother, and Delbert's wife, Carol. Delbert stated Leonard had gotten himself into trouble in connection with a body that had been pulled out of the Wakarusa River. Later, when Leonard arrived, Warner brought up the matter of the body in the river. Leonard told Warner to shut up and said he was worried he might have AIDS because he had split his knuckle hitting the victim in the head. Warner further testified that Leonard said he could not find Rudell, who was staying with a lawyer. Leonard said, if Rudell sticks with the plan, another guy would do time for the murder and Leonard would be all right. But, if Rudell changes the game plan, Leonard said, "I'm done."
> Warner also testified about his conversation with Leonard, stating, "He said, 'I'm afraid that if the police get their hands on [Rudell] it ain't going to be good,' and he kind of went on and was talking about if they get their hands on him then the bitch is going to go his way, referring to Kenny Cook's wife. It was Beth." Asked how he knew that, Warner replied, "He said that, he said the bitch, and I asked him who it was and he said the guy that's doing the time for this murder or going to do time for the murder."
> When questioned why he had not related the conversation earlier, Warner answered,
> > "Nothing ever has been brought up about it. I come back, I turned myself into the State of Oklahoma, and I come back and I was in [jail] and I was sitting there and I kind of looked at Kenny and said, 'So, you are the one doing the time for it.' And he said, 'Yeah.' And I told Kenny what I had heard and he kind of laughed."

Cook, 135 P.3d at 961.

16

The trial court denied petitioner's motion for new trial, finding that Warner's credibility was in doubt. On appeal, the petitioner argued that the trial court should not have considered Warner's credibility in deciding his motion. The Kansas Supreme Court disagreed. The Court determined that it was appropriate for the trial court to consider the credibility of Warner in considering the motion for new trial. Cook, 135 P.3d at 1168.

The court finds no basis for the argument asserted by the petitioner. The court does not find that the trial court's decision was an unreasonable determination of the facts in light of the evidence presented. The trial judge reached her findings after an evidentiary hearing where she heard the testimony of Warner. The court is not persuaded that the trial judge's rejection of Warner's testimony was erroneous, much less that it was objectively unreasonable. See Rice v. Collins, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). The court further notes that a petitioner is not entitled to federal habeas review based upon a claim of actual innocence absent an independent constitutional violation in the state court proceeding. Herrera v. Collins, 506 U.S. 390, 400 (1993); see also Schlup v. Delo, 513 U.S. 298, 315 (1995). There is no independent constitutional component of petitioner's claim.

17

Moreover, petitioner has fallen woefully short of clearing the "extraordinarily high" hurdle necessary to succeed on a claim of actual innocence. See Herrera, 506 U.S. at 417. In sum, this claim must be denied.

## VI.

Finally, the petitioner contends that his sentence violates the United States Constitution. He argues that his sentence of fifteen years to life violated the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000).

The petitioner was convicted of a Class B felony under Kansas law. He was sentenced to a term of imprisonment of fifteen years to life in accordance with K.S.A. 21-4501(b), which provides as follows:

> Class B, the sentence for which shall be an indeterminate term of imprisonment, the minimum of which shall be fixed by the court at not less than five years not more than 15 years and the maximum of which shall be fixed by the court at not less than 20 years nor more than life.

The petitioner suggested on appeal that his sentence ran afoul of Apprendi because the jury's verdict authorized a sentence of only five to twenty years. The Supreme Court rejected petitioner's argument and found it was based on a "flawed premise." Cook, 135 F.3d at 1169. Here, the petitioner again raises the argument, suggesting that the trial court improperly considered his prior drug addiction issues in reaching the sentence of fifteen years to life.

18

Apprendi holds that facts other than prior convictions must be proved to a jury beyond a reasonable doubt before they can be used to increase the punishment for a crime "beyond the prescribed statutory maximum." Apprendi, 530 U.S. at 490.  The court finds no violation of Apprendi by the trial court.  The sentence in this case was within the term allowed by the statute of conviction.  The trial court did not increase the petitioner's sentence beyond the maximum term.  Accordingly, Apprendi provides no basis for relief here.

VII.

In sum, the court fails to find that the petitioner is entitled to relief on any of his claims.  Accordingly, his request for habeas relief shall be denied.

**IT IS THEREFORE ORDERED** that petitioner's application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. # 1) be hereby denied.

Dated this 13th day of May, 2008 at Topeka, Kansas.

                        s/Richard D. Rogers
                        United States District Judge